1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

W.T., a minor, by and through
Guardians ad Litem and individuals,
C.P. and B.P.,

                          Plaintiffs,

        v.

DOUGLAS        COUNTY        SCHOOL
DISTRICT,

                          Defendant.

Case No. 3:21-cv-00242-ART-CLB

ORDER

11   Plaintiff W.T., a minor child by and through his parents and Guardians ad

12   Litem C.P. and B.P, as well as C.P. and B.P. individually (collectively "Plaintiffs"),

13   bring this action for review of a decision by a State Review Officer ("SRO") of the

14   Nevada Department of Education upholding the decision of a Hearing Officer

15   ("HO") which affirmed the decision of Defendant Douglas County School District

16   ("DCSD") to exit W.T. from special education services in January of 2019.

17   Plaintiffs filed a motion for summary judgment which argues that the SRO erred

18   in upholding the HO's finding that DSCD met its burden to show W.T. was not

19   eligible for special education services in January of 2019, that various procedural

20   errors were not harmless, and that DCSD improperly failed to disclose certain

21   records and materials. (ECF No. 42.) DCSD filed a motion for judgment on the

22   administrative record, or in the alternative for summary judgment, which argues

23   that the SRO's decision was supported by the record and that any procedural

24   errors were harmless because W.T. was ultimately ineligible for special education

25   services. (ECF Nos. 43, 46, 66.) DCSD also filed a motion to strike Plaintiffs'

26   supplemental disclosure containing a recent Individualized Education Program

27   ("IEP") and psychological report, and Plaintiffs also seek costs and attorneys' fees.

28   (ECF No. 63.)

1    Because the Court finds that W.T. was improperly exited from special
2    education services and that this error was not harmless, the Court grants
3    Plaintiffs' motion for summary judgment. The Court also grants DCSD's motion
4    to strike and awards costs and attorneys' fees.

5    **I.    BACKGROUND**

6    W.T. began school in New Jersey. (Admin. R. at 1521.) W.T. was diagnosed
7    with attention deficit hyperactivity disorder ("ADHD") in or about December of
8    2014, which was during W.T.'s first grade year. (*Id.* at 1207.) During W.T.'s
9    second grade year, his family moved to Nevada within the DCSD boundaries. (*Id.*
10   at 1204.) On January 27, 2016, W.T.'s IEP team determined that W.T. required
11   specially designed instruction under the category of specific learning disability
12   ("SLD") based on the discrepancy between his average IQ and his below average
13   academic performance. (*Id.* at 1213.) His teachers observed that while W.T. "is a
14   student that enjoys learning[,]" W.T. "requires constant redirection in order to be
15   successful," that he "struggles daily to stay focused on tasks," and that he "enjoys
16   math and tends to do well, but requires being retaught for most lessons –
17   stemming from his high distract[i]bility." (*Id.* at 1240–41.) During that time, W.T's
18   IEP plan permitted W.T. to access the special education resource room for help
19   completing assignments, including having his math assignments read to him,
20   and as an alternative place for W.T. to focus when it became too loud during
21   music class. (*Id.* at 1229.) The IEP plan also included extra time and explanations
22   by teachers in general education classrooms as well as headphones or earplugs
23   when general education classrooms became noisy. (*Id.*)

24   In his final year of elementary school, when W.T. was in the fifth grade,
25   DCSD issued a written notice of intent to conduct a mandatory three-year
26   reevaluation of W.T.'s special education status to W.T.'s parents. (*Id.* at 1286.)
27   The notice was issued October 3, 2018, of W.T.'s fifth grade year. A Multi-
28   Disciplinary Team ("MDT") was constituted to review W.T.'s records and

performance and prepare a report. (*Id.* at 1340.) In a December 13, 2018 phone call noted in DCSD's special education contact log, special education teacher Meghan McQuain stated to "Papa J," W.T's grandfather, that W.T.'s reevaluation would consider the disability category of health impairment other than orthopedic impairment ("HI") as well as SLD. (*Id.* at 1613, 1773.)

During that fall semester, Papa J tutored W.T. on a regular basis. (*Id.* at 1320.) W.T.'s performance that semester improved somewhat, although W.T. remained below average in areas such as reading comprehension, math computation, and written expression. (*Id.* at 1318.) While the MDT was still undertaking its three-year evaluation, W.T.'s IEP team renewed W.T.'s annual IEP. The renewed IEP included provisions that grade level texts would be read aloud to W.T., that W.T. could go to the special education resource room when frustrated or upset, that W.T. could have access to oral fidgets such as gum and hard candies to help keep his fingers out of his mouth, and that W.T. could take tests in a less distracting environment than the general education classroom. (*Id.* at 1247.)

In January of 2019, following the winter break, W.T.'s behavior regressed such that his science and social studies teacher described his behavior as "defiant/disruptive when he doesn't want to do something, which is most of the time." (*Id.* at 1365.) A January 8, 2019 email to Papa J described how W.T. "REFUSED [sic] to copy a data chart for an experiment[,]" how "[i]n math, he refused to participate and even putting a pencil in his hand was nearly impossible[,]" and how W.T. "made utterances sounding like a cat" when his teachers would try to talk to him. (*Id.* at 874–75.)

Dr. Susan Martin, school psychologist, completed the report on behalf of the MDT which was dated January 23, 2019. (*Id.* at 1339–49 ("MDT Report").) The report "formally examine[d] whether William meets the two general qualifying conditions required for special education eligibility: 1) the identification of an

[IDEA] *disability*, and 2) the determination of a *need* for special education services." (MDT Report at 1 (emphasis in original).) The report was based on review of previous assessments and school records, student and parent input, teacher reports and observation, as well as academic and cognitive assessments. (*Id.* at 2.) The report noted that W.T. "has had difficulties with his behavior that have included refusal to complete his work, refusal of help from his teachers, and defiance in the classroom. He has been diagnosed with [ADHD], but his teacher stated that they do not see attention problems in the classroom, but more defiance." (*Id.*)

In the section describing parent and teacher input, the MDT Report stated that W.T. "can be sweet" and "productive when he is interested in the topic or activity[,]" but that W.T. "had significant difficulties complying with work demands. He exhibits negative behaviors when he is not interested in the task or the activity appears difficult. [...] He has few friendships and often acts immature." (*Id.* at 3.) W.T. scored below standards in all semesters of grades two through four and failed the Nevada Criterion Referenced Test in both third and fourth grade. (*Id.* at 5.) On the Kaufman Tests of Educational Achievement, W.T. achieved percentile ranks between 16 and 50, which were noted as "average." (*Id.*) The MDT Report concluded that "[r]egarding the condition of *disability*, this evaluation found William's academic achievement is at an expected level for his age and grade. He is making adequate progress to meet age and grade level standards in reading, writing and math. In addition, this evaluation indicates that William does not appear[] to require specially designed instruction to meet either age or grade level standards of performance." (*Id.* at 11.) The "Health Assessment" section stated that "W.T. passed his vision and hearing exams. [W.T.] appears to be healthy." (*Id.* at 6.)

The IEP team met on January 24, 2019 for the three-year reevaluation. (Admin. R. at 1354.) In line with the conclusion of the MDT Report, W.T.'s

teachers and Dr. Martin stated that W.T.'s poor performance was due to W.T. choosing not to complete work that did not interest him and that he was capable of accessing the curriculum when he wanted. (*Id.* at 1356.) The IEP team determined that W.T. was no longer eligible for special education services under the category of SLD. (*Id.* at 1351.) The IEP team also informally considered the category of health impairment and stated that W.T. would not be eligible under this category either. (*Id.* at 1835.) A school nurse was not present at the meeting. (*Id.* at 1856–57.) Dr. Martin said that a 504 plan would be a "better fit" and that it would be better to transition out of special education before middle school "since we are the ones that know him so well[,]" though Papa J voiced concern "that he is making this transition now." (*Id.* at 1356.) W.T's parent B.P. indicated agreement with the decision to transition out of the IEP. (*Id.* at 1354.)

W.T. performed poorly following the January 24, 2019 meeting. The supports given to W.T. after the termination of his IEP consisted of "Peer grouping, proximal seating, 'focus' cushion" (*Id.* at 1365), as well as acceptance of late work, adjusted grading, "audio-support reading" and small group support (*Id.* at 1358). W.T. no longer had access to the special education resource room to calm down when upset or to take tests in a less distracting environment. Several of his teachers scoring him "poor" or "below average" in the areas of "classroom work" and "homework" with one teacher noting "low-average on MAPS[.]" (*Id.* at 1365, 1383.)

W.T.'s parents requested an independent educational evaluation ("IEE") (*Id.* at 1381) and DCSD funded an IEE with clinical psychologist Dr. Susan Ayarbe, who completed a report in July of 2019. (*Id.* at 1500–22 ("Dr. Ayarbe IEE").) The IEE noted that "[c]oncerns noted by the family focused on [W.T.'s] poor academic progress, social isolation, anger and aggression, defiance, non-compliance and some obsessive behaviors[,]" and stated that "[t]he purpose of the IEE is to outline cognitive, neuropsychological, academic, and social/emotional strengths and

weaknesses and their relationship to these concerns, identify appropriate diagnoses and make treatment recommendations." (Dr. Ayarbe IEE at 1.) The IEE was based upon several cognitive tests such as the Wechsler Intelligence Scales for Children and the Children and Adolescent Memory Profile, rating scales and assessments completed by parents and teachers, interviews with family and with W.T., and a review of records. (*Id.* at 11.)

Dr. Ayarbe's IEE related that W.T. "reported that he very often feels sad and angry. When asked what causes his emotional distress, [W.T.] reported that he is often left out of things, has trouble making and keeping friends, is often teased and that other kids hate to be with him." (*Id.* at 2.) The IEE related that W.T. stated, "I get mad all at once and don't know why" and described yelling at teachers and his parents, then becoming ashamed of this behavior after he has calmed down. (*Id.*) W.T.'s parents reported that "the police have been called to the home on several occasions by neighbors due to [W.T.'s] loss of verbal, behavioral and emotional control in response to a parental request to stop playing video games." (*Id.* at 4.) The IEE noted that "six of six raters reported elevated concerns indicating that they view [W.T.] as exhibiting marked and pervasive levels of functional impairment, including struggling to successfully engage in appropriate behavior across a variety of situations including interactions with others, performing age appropriate tasks, regulating mood and performing school related tasks." (*Id.*)

The IEE set forth Dr. Ayarbe's conclusion that W.T. "meets criteria for a diagnosis of Disruptive Mood Dysregulation Disorder[; Major Depressive Disorder with anxious distress, moderate severity; ADHD, combined type presentation, moderate severity; Specific Learning Disorder with impairment in Reading, mild severity; and Enuresis, diurnal and nocturnal, provisional.]" (*Id.* at 1.) The IEE addressed at length the issue of "how much of th[e] child's inattentive, disorganized and forgetful behavior is willful (e.g., under his control) and how

much is not[,]" explaining that "the most important thing to remember when working with [W.T.] is to remember that in spite of how competent he looks, he needs far more support with attention and organization issues than he looks like he needs." (*Id.* at 5–6.) The IEE's "Treatment Plan" stated that "[a]n Individualized Educational Plan (IEP) is recommended as the most appropriate school-based method to support [W.T.]" (*Id.* at 1.)

DCSD also agreed to conduct an Occupational Therapy Evaluation ("OTE") which was prepared by Rosemary Thomas (Admin. R. at 615–19 ("Thomas OTE")), and a Functional Behavior Assessment ("FBA") evaluation prepared by France Fischer and Susan Harootunian (*Id.* at 621–25 ("Fischer-Harootunian FBA")). The Thomas OTE was based on a review of work samples, teacher interviews and assessments completed by teachers, classroom observations, and a sensory profile questionnaire completed by W.T. (Thomas OTE at 1.) The OTE explained that "[W.T.'s] teachers stated that he has demonstrated the ability to complete work when he appears to be motivated. For example, in a class with Mrs. Cavett, she reported that [W.T.] was seen to sit at his desk and not initiate an assignment until it was announced that students who completed the task within a specific time period would be able to participate in an activity in the quad. [W.T.] was then seen to quickly complete his work and was invited to participate in the fun activity." (*Id.*) The sensory profile scores indicated greater sensation avoiding tendencies than most people. (*Id.* at 4.) The OTE concluded that W.T. has "[s]ome [p]roblems with areas of sensory processing which can be addressed utilizing school wide positive behavior programs and universal classroom supports" and listed as suggested accommodations headphones/earplugs, preferential seating, ample warnings of changes in schedule, extra time to complete work, and pairing visual information with verbal instruction, among other items. (*Id.* at 5.)

The Fischer-Harootunian FBA was based on a record review, teacher interview, a functional assessment screening tool, and classroom observations.

(Fischer-Harootunian FBA at 1.) The FBA described teacher observations of behaviors such as fidgeting, blurting, and not working in both elementary and middle school. (*Id.* at 2–4.) The FBA observed that "[W.T.] is currently benefiting from universal classroom supports" and that "teachers report off-task behavior of mild severity" which is "triggered when school staff give directions to be involved in academic tasks." (*Id.* at 4–5.) The FBA concluded that "a Positive Behavior Intervention Plan is not indicated at this time" since W.T. was benefiting from universal classroom supports "available to all students in the general education environment." (*Id.* at 5.)

An IEP team convened again on August 26, 2019 and considered W.T.'s special education eligibility under the classification of specific language impairment ("SLI") and determined that he was not eligible. (Admin. R. at 1534.) The IEP team reviewed and considered the Fischer-Harootunian FBA and the Thomas OTE at this meeting. (*Id.* at 1532, 1541.) An IEP team then again convened on November 12, 2019, and considered eligibility under the categories of SLD and serious emotional disturbance ("ED"), and again determined that he was not eligible. (*Id.* at 1572, 1576.)

DCSD agreed to conduct an additional FBA, which was completed by Dr. Maria Stevenson in February of 2020. (*Id.* at 564–88 ("Dr. Stevenson FBA").) Dr. Stevenson's FBA was based on a records review, a questionnaire given to school staff and parents, and on four classroom observations. (Dr. Stevenson FBA at 1.) In response to the questionnaire, W.T.'s teachers identified work refusal and blurting as concerning behaviors. (*Id.* at 3.) Two teachers indicated that work refusal occurs 5–10 times per class and one indicated 0–5 times per class; one teacher indicated that blurting occurs 5–10 times per class and another indicated 0–5 times per class. (*Id.* at 4.) The FBA contains narrative descriptions of classroom observations describing such incidents, for example that W.T. "banged the table with his fist and hit his Chromebook with his fist 3 times[.]" (*Id.* at 6.)

The percentage of classroom time that W.T. successfully engaged with instructions given to the class, labeled as "group compliance," was summarized in a table with an entry for each observation, and the eight entries ranged from 0% to 58%. (*Id.* at 17.) "Individual compliance," i.e. compliance with instructions given directly to W.T. individually, were also listed and ranged from 43% to 100%. (*Id.*) The FBA concluded with thirteen recommendations, including implementing a formal behavior plan, increasing work times, and setting clearer expectations. (*Id.* at 23–24.)

Finally, on June 22, 2020, an IEP team again convened and considered the categories of HI, ED, and SLD, with a school nurse present, and the IEP team again determined that he was not eligible. (*Id.* at 1637, 1652, 1657.) Plaintiffs filed their initial Request for Due Process ("RDP") on March 16, 2020, and on August 24, 2020, filed their Second Amended RDP, the operative RDP. (*Id.* at 303–04.) The due process hearing was conducted on November 2–4, 2020, and the issue to be determined was: "Commencing January, 2019, through the present, was [W.T.] eligible to receive special education services and programs?"[1] (*Id.* at 303–07.) On December 10, 2020, the HO issued the HO Decision which upheld DCSD's findings that W.T. was not eligible. (*Id.* at 303–18 ("HO Decision").) On March 9, 2021, the SRO issued the SRO Decision which upheld the HO Decision. (ECF No. 1-1 ("SRO Decision").) Plaintiffs initiated this case for judicial review on May 26, 2021. (ECF No. 1.)

## II.   LEGAL STANDARD

The Individuals with Disabilities Education Act ("IDEA") guarantees children with disabilities a free appropriate public education ("FAPE"). 20 U.S.C. § 1400(d)(1)(A). "A FAPE must be tailored to the unique needs of the handicapped child by means of an individualized educational program (IEP)." *M.C. by & through*

---

[1] The due process hearing had been bifurcated with a second set of issues to be heard in January 2021, however on December 31, 2020 Plaintiffs notified the SRO of their withdrawal of the remaining issues. (ECF No. 1-1 at 1-2.)

*M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017). When formulating an IEP, a school district "must comply both procedurally and substantively with the IDEA." *Id.* (citing *M.L. v. Fed. Way Sch. Dist.*, 394 F.3d 634, 644 (9th Cir. 2005)). IDEA's procedural requirements are designed to ensure that the process "will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.* (citing *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017)).

Not all procedural violations constitute a denial of a FAPE. *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1003 (9th Cir. 2017) (citing *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 938 (9th Cir. 2007)). A child is denied a FAPE when procedural inadequacies result in the loss of an educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process. *Id.* However, a procedural error is harmless if the student is substantively ineligible for IDEA benefits. *Id.*

### A.   REEVALUATION OF STUDENTS WITH DISABILITIES

A child is substantively eligible for special education and related services if the child is a "child with a disability," which is statutorily defined, in relevant part, as a child with a serious emotional disturbance, other health impairment, or specific learning disability and who, by reason thereof, needs special education and related services. 20 U.S.C. § 1401(3)(A); *L.J.*, 850 F.3d at 1003. In order to provide a FAPE to all children with disabilities, States must first identify those children and evaluate their disabling conditions. *Timothy O.*, 822 F.3d at 1110. Accordingly, IDEA requires that every State have procedures in place that are designed to identify children who may need special education services. *Id.*; 20 U.S.C. § 1412(a)(3)(A). Once identified, those children must be evaluated and assessed "in all areas of suspected disability" so that the school district can begin the process of determining what special education and related services will address the child's individual needs. *Timothy O.*, 822 F.3d at 1111; 20 U.S.C.

§ 1414(b)(3)(B).

In conducting the evaluation, school districts must, among other requirements: (1) use a "variety of assessment tools and strategies" without relying on "any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child[;]" (2) use "technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors[;]" and (3) ensure that all assessments are conducted by trained and knowledgeable personnel and in accordance with instructions. *Timothy O.*, 822 F.3d at 1111; 20 U.S.C. § 1414(b)(3)(A). A reevaluation employs the same standard as an initial evaluation and may be initiated either by the local education agency or by the child's parents or teacher but must occur at least once every three years. 20 U.S.C. § 1414(a)(2)(A); NAC 388.440.

State regulations implementing IDEA set forth specific evaluation requirements for each category of suspected disability. *See* NAC 388.387–388.427. These regulations prescribe both the composition of the IEP team as well as the subjects or factors that the IEP team must consider, which, in certain instances, include certain mandatory evaluations such as a health assessment. *E.g.*, NAC 388.402(4)(a) (requiring a health assessment when considering the eligibility of a student with a health impairment other than an orthopedic impairment); *see* NAC 388.365 (setting forth requirements for a health assessment).

### B.    STANDARD OF REVIEW

IDEA requires that a State provide for an impartial due process hearing conducted by the State or local educational agency, as determined by State law. 20 U.S.C. §§ 1415(f)(1)(A). If the due process hearing is conducted by a local educational agency, IDEA requires that a State provide for an impartial appellate

review of the due process hearing by the State educational agency. 20 U.S.C. § 1415(g)(1). A party may bring a civil action for review of a decision by a State educational agency (either a due process hearing under subsection (f) for which there is no appeal or an appeal under subjection (g)) in a State court of competent jurisdiction or in a federal district court, and the court shall, "basing its decision on the preponderance of the evidence[,] grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i). Thus, Congress intended judicial review in IDEA cases to differ substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review. *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 887 (9th Cir. 2001) (citing *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir.1993)) (internal quotations omitted). However, courts are not free to substitute their own notions of sound educational policy for those of the school authorities they review. *Id.* (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207 (1982)).

Nevada employs a "two-tiered" state administrative system in which the decision of a Hearing Officer is appealable to a State Review Officer. In a two-tiered state administrative system, due weight should be accorded to the final state determination—that of the SRO—unless the SRO's decision deviates from the credibility determination of a witness whom only the HO observed testify. *Amanda J.*, 267 F.3d at 889. A district court should afford "some deference" to the final state decision where the decision is "thorough and careful," with the amount of deference given being within the discretion of the district court. *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017) (citing *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994)).

///

III.   **DISCUSSION**

The Court finds that DCSD was on notice that the category of health impairment other than orthopedic impairment ("HI") was a category of suspected disability at the January 24, 2019 meeting. The Court further finds that DCSD violated IDEA because DCSD failed to properly consider HI at the January 24, 2019 meeting. The Court further finds that this error was not harmless because a preponderance of the evidence shows that W.T. was eligible for special education services.

**A.   SUSPECTED DISABILITY**

The disability category of HI is suspected and must, therefore, be assessed when the school district has notice that the student has displayed symptoms of the disability. *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F. 3d 1105, 1110 (9th Cir. 2016). The Ninth Circuit has stated that "the informed suspicions of parents, who may have consulted outside experts, trigger the requirement to assess, even if the school district disagrees with the parent's suspicions because the identification and assessment of children who have disabilities should be a cooperative and consultative process." *Id.* (internal quotations omitted). If either school officials or the parents suspect disability, a test must be performed so that parents can receive notification of and have the opportunity to contest conclusions regarding their children. *Id.*

Assessment of HI is properly conducted when the State regulatory requirements that set forth the composition of the eligibility team and the required areas of inquiry are followed. *See* NAC 388.402. Adherence to the regulatory requirements ensures that the eligibility team has the full benefit of information and expertise. A student is eligible for special education under the category of HI when the student has a health impairment other than an orthopedic impairment which could reasonably be interpreted as adversely affecting the educational performance of the student and, by reason thereof,

needs special education and related services. NAC 388.402(1).

A preponderance of evidence shows that DCSD was on notice that W.T. suffered from ADHD and that he may be eligible under the HI category. The SRO writes, "Student's fifth-grade teachers were aware of the Student's earlier clinical diagnosis of Attention Deficit Hyperactivity Disorder (ADHD); however, they did not see attention problems in the classroom that rose to the level of interfering with the Student's learning. The Student was able to attend appropriately to the conversation and assessments conducted by [Dr. Martin]." (SRO Decision at 6.) Furthermore, as Plaintiffs point out, DCSD stated to Papa J in a December 13, 2018 phone call that eligibility under HI would be considered at the January 24, 2019 reevaluation. (Admin. R. at 1613 ("I told him that the 3 possible outcomes that could happen were: 1 he remains on an IEP under [S]LD. 2 He remains on an IEP under HI. 3 He moves to a 504 with accommodations.").)

The SRO Decision states that "the record does not support a determination that the District was on notice of HI as a suspected disability on January 24, 2019." (SRO Decision at 23.) The SRO Decision reaches this conclusion by pointing to the distinction between a diagnosis of ADHD and the regulatory definition of HI which requires not only a diagnosis of ADHD or other impairment, but also that the impairment adversely affect the educational performance of the pupil. NAC 388.046. In holding that DCSD was not on notice of HI as a suspected disability, the SRO Decision relies on the testimony that while W.T.'s teachers and Dr. Martin were aware of W.T.'s diagnosis, they did not believe that W.T.'s ADHD adversely affected his performance.

The threshold for a school district being on notice of a suspected disability category must be lower than the threshold for satisfying the category's criteria so that the school district does not only evaluate students who the school district is certain would satisfy the category's criteria. This would not only render the language of "suspected disability" superfluous as a matter of statutory

interpretation, but would contravene the purpose of IDEA. The SRO Decision employed too high a standard for being on notice of HI, relying on testimony in which W.T.'s teachers and Dr. Martin opined that W.T. was not eligible, which circumvented the information-gathering and deliberative process by which eligibility was supposed to be determined. *See Timothy O.*, 822 F.3d at 1118 (rejecting "the district court's holding that, although [the school district] was aware [of suspicions that the student] might be autistic, it did not need to assess him for autism because one of the District's staff members [...] informally observed [the student] and did not see him exhibit any such behavior."). DCSD teachers and officials were aware that W.T. had ADHD and that he previously required an IEP to access the curriculum, so DCSD had a duty to evaluate the category of HI. In addition, the December 13, 2018 phone call log stating that DCSD planned to evaluate W.T. under the HI category shows that DCSD had actual notice of HI as a category of suspected disability.

### B.   EVALUATION OF HI

Having held that the SRO Decision erred in determining that DCSD was not on notice of HI as a category of suspected disability, the Court must determine whether the January 24, 2019 IEP team adequately considered HI. The SRO Decision states that "the testimony at the hearing and documents suggest that this eligibility team discussed HI and ED as two other eligibility categories which might be formally considered, but ultimately decided, based upon the triennial evaluation completed, that it was not necessary to consider HI or ED at this time because the Student was able to access and produce age and grade-level appropriate work without specially designed instruction." (SRO Decision at 22.) In other words, the SRO Decision acknowledges that HI was not "formally considered[,]" (*Id.*) though it was discussed at some level, and the Court must determine whether the consideration satisfies the requirements of NAC 388.402.

The Court finds that DCSD erred in two respects: (1) the IEP team was not

appropriately constituted; and (2) a health assessment was not conducted.

## 1.    IEP TEAM COMPOSITION

NAC 388.402 requires the eligibility team to consist of: (1) a school psychologist; (2) a teacher of special education; (3) a regular teacher of the pupil or, if none, a person qualified to teach the pupil; (4) a school nurse or other person qualified to interpret an assessment of the health of the pupil; (5) a parent of the pupil; and (6) if not otherwise a member of the team, one or more persons with sufficient knowledge of the pupil to interpret information relating to the pupil's social, emotional, developmental and familial condition. The SRO Decision states that the January 24, 2019 eligibility team "was appropriately constituted to consider the Student's eligibility under the category of SLD"[2] and that the "team did not include a school nurse." (SRO Decision at 7.)

Procedural safeguards are built into the IDEA to ensure that a child's education is fair and appropriate and the parents have an opportunity to participate in the IEP formulation process. *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1007 (9th Cir. 2017). Attendance of individuals with knowledge or special expertise in evaluating health conditions is key to ensuring that parents are fully informed. Here, the key distinction between the required composition for consideration of HI and SLD is, as the SRO Decision notes, the presence of the school nurse or other person qualified to interpret an assessment of the health of the pupil. *See* NAC 388.365 ("Any interpretation of an assessment of health must be made by a person qualified to assess the condition at issue."). Because such a person was not present, the January 24, 2019 IEP team was not appropriately constituted to consider HI.

---

[2] To consider the disability category of SLD, the eligibility team must consist of: (1) a regular classroom teacher of the pupil or, if the pupil does not have a regular teacher, a teacher qualified to teach a pupil of the pupil's age; (2) a special education teacher or specialist with knowledge in the area of the suspected disability; (3) a school psychologist; (4) a parent of the pupil; and (5) if not otherwise a member of the team, one or more persons qualified, because of personal knowledge of the pupil, to interpret information relating to the pupil's health, family, and social and emotional condition. NAC 388.420.

### 2.   HEALTH ASSESSMENT

Beyond the IEP team composition requirement, NAC 388.402 requires the IEP team to "conduct an evaluation of the pupil[,]" which must "[a]ssess the health of the pupil" and "[a]nalyze the ability of the pupil to perform in a regular classroom." NAC 388.365 provides a list of items that a health assessment may include and requires that "[a]ny interpretation of an assessment of health must be made by a person qualified to assess the condition in issue."

The MDT Report prepared for the January 24, 2019 meeting does not evaluate W.T.'s ADHD in depth. The MDT Report states in its "Background History" section that W.T. "has been diagnosed with Attention Deficit Disorder, but his teacher stated that they do not see attention problems in the classroom, but more defiance." (MDT Report at 2.) However, the MDT Report did not include classroom observations of W.T. The "Health Assessment" section merely states that "[W.T.] passed his vision and hearing exams. [W.T.] appears to be healthy." (*Id.* at 6.) The section did not mention or undertake any analysis of W.T.'s ADHD and how it may manifest in the classroom setting, as opposed to more controlled settings where W.T. is less distracted. As part of the MDT Report, W.T.'s teacher and mother were asked to complete the Clinical Assessment of Behavior, an evaluative instrument which includes as an item "Attention-Deficit/Hyperactivity[,]" for which W.T. scored at the 75th percentile, which was rated "Normal range[.]" (*Id.* at 9.) This cursory treatment of ADHD cannot be considered a proper health assessment of "the condition in issue" per NAC 388.360. The Court therefore finds that the January 24, 2019 IEP team should have considered HI and did not properly consider HI.[3]

The SRO Decision notes that following the January 24, 2019 meeting, W.T.'s "work completion issues worsened," that he received final grades of C's

---

[3] Plaintiffs also argue that DCSD erred by failing to provide response to intervention ("RTI") data as well as test protocols. However, as DCSD points out, this issue was not raised in the due process complaint and is therefore foreclosed. 34 C.F.R. § 300.511(d).

and D's with one B on his fifth grade report card, and that the "5th Grade Language Arts Teacher expressed concerned regarding the Student's work completion and Student coming to class 'upset or angry' and needing time to work through 'moods.'" (SRO Decision at 7–8.) The SRO Decision states that the August 26, 2019 IEP team properly considered the category of speech and language impairment and found that W.T. was not eligible. (*Id.* at 25.) The SRO Decision states that the November 12, 2019 IEP meeting was again not properly constituted to consider the category of HI since a school nurse was not present but concluded that this procedural error was harmless since W.T. was ultimately ineligible for special education benefits. (*Id.* at 28.) The SRO Decision notes that disability category of HI was not properly considered until the June 22, 2020 IEP meeting—almost seventeen months after the January 24, 2019 meeting. (*Id.* at 14.) Throughout this time, W.T. was not on an IEP.

## C.   LOSS OF EDUCATIONAL OPPORTUNITY

Having held that DCSD erred in not considering HI when DCSD exited W.T. from special education services, the Court must now determine whether this error merits relief. DCSD's primary argument is that the SRO Decision correctly held that any procedural error in failing to consider W.T. under all relevant categories throughout the four meetings was harmless because "[g]iven that a preponderance of the evidence supports the determination reached by this eligibility team that the Student did not require specially-designed instruction to access their education, consideration of whether or not the Student met the definitional eligibility criteria of HI would not have changed the overall outcome, which was that the Student was not eligible for special education services[.]" (SRO Decision at 28–29.)

"Not all procedural violations constitute a denial of FAPE." *L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1003 (9th Cir. 2017). "A child is denied a FAPE when procedural inadequacies result in the loss of an

educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process. *Id.* However, "[a] procedural error is harmless if the student is substantively ineligible for IDEA benefits." *Id.*

As Plaintiffs point out, 34 C.F.R. § 300.305(e) requires that a student be properly evaluated before determining that the student is no longer a child with a disability. Plaintiffs cite to *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105 (9th Cir. 2016), which states that a loss of an educational opportunity occurs when there is a "strong likelihood" that but for the procedural error, an alternative placement "would have been better considered." *Timothy O.*, 822 F.3d at 1124 (citing *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1047 (9th Cir. 2013)). The Ninth Circuit in *Timothy O.* describes the importance of IDEA's procedural requirements for gathering the information necessary to make an informed eligibility determination. *Id.* at 1125–26 ("Even if true, however, the argument [that the school district would have come to the same conclusion regarding eligibility if proper assessments had been conducted] misses a central concern of our inquiry. The creation of an IEP is not a unilateral enterprise by the school district, but rather, a collaborative process that necessitates parents' input. Regardless whether [school] staff might have made identical recommendations in the absence of informed parental participation in the collaborative process, the failure to obtain necessary information about [the student's] disorder prevented an informed discussion with his parents about his specific needs[.]").

In this case, the procedural violations resulted in improper assessment of W.T.'s ADHD at the January 24, 2019 meeting. Despite this procedural error, W.T. was taken off his IEP and remained without an IEP during the nearly seventeen month period between that exiting meeting and the meeting on June 22, 2020 when HI was properly assessed. W.T.'s ADHD was assessed in Dr. Ayarbe's IEE, which clearly stated that W.T. has ADHD, as well as several other

disorders, and recommended an IEP (Dr. Ayarbe IEE at 10). It was only at the June 22, 2020 IEP meeting, the fourth of the four IEP meetings, when a school nurse was present and HI was properly assessed for the first time. Although the eventual provision of this information does "cure" the failure to produce this information at the January 24, 2019 meeting, it is true that HI was not properly assessed until June 22, 2020. By then, W.T. had gone three semesters, including his final semester of elementary school (fifth grade) and first full year of middle school (sixth grade), without an IEP. The Court will therefore consider the information available at the June 22, 2020 meeting to determine eligibility. *See L.J. by & through Hudson v. Pittsburg Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017) ("When making this assessment of whether an eligibility determination is 'appropriate' under the IDEA, this court looks to the time of the child's evaluation by the School District.").

### 1.    DEFERENCE TO SRO DECISION

Prior to determining whether, by a preponderance of evidence, W.T. demonstrated a need for special education services, the Court must address the degree of deference to afford the SRO Decision. Generally, "some deference" is accorded a final state decision that is "thorough and careful." *See M.C.*, 858 F.3d at 1194. The Court finds that the SRO Decision should not be afforded significant deference because its analysis of the information provided in the evaluation reports was relatively cursory and minimized evidence that W.T. was unable to access and performing poorly in general education without an IEP.

Both the HO Decision and the SRO Decision gave only very cursory treatment to the Dr. Ayarbe IEE, which explains at length how "the most important thing to remember when working with [W.T.] is to remember that in spite of how competent he looks, he needs far more support with attention and organization issues than he looks like he needs." (Dr. Ayarbe IEE at 5–6.) The HO Decision acknowledged as a finding of fact that the Dr. Ayarbe IEE did

recommend that W.T. have an IEP but did not include any detailed discussion of the substance of the report. (HO Decision at 9–10.) In the analysis section, the HO Decision did not discuss the content of the Dr. Ayarbe IEE at all, notwithstanding the fact that the Dr. Ayarbe IEE makes observations and provides explanations which stand in contrast with the proposition that "[d]espite having the ability to do the school work, [W.T.] consistently and intentionally chose not to." (*Id.* at 15.)

The SRO Decision made more lengthy findings of fact regarding the Dr. Ayarbe IEE, including that Dr. Ayarbe "described moderate ADHD as characterized by marked and pervasive deficits in the ability to regulate movement and impulsivity and effectively direct attention" and also that Dr. Ayarbe "conceded her diagnosis were [sic] clinical in nature rather than educational[.]" (SRO Decision at 10.) In analyzing whether error occurred in the consideration of W.T. under the HI category, the SRO Decision states that "[u]pon consideration of [the Dr. Ayarbe IEE], IEE No. 2, and the perspectives shared by the eligibility team members, the team determined that [W.T.] had diagnoses that could meet the definition of health impairment. However, the team members disagreed as to whether [W.T.] required specially-designed instruction in order to address such an impairment." (*Id.* at 30.) The SRO Decision held that "[t]he School District's determination is supported by the evidence in the administrative record and applicable law" and that "[t]he underlying record demonstrates that [W.T.] is able to access their education and perform at grade-level when motivated to do so." (*Id.* at 30–31.) However, like the HO Decision, the SRO Decision does not actually consider the thrust of the Dr. Ayarbe IEE, which is that ADHD impacts motivation and can give rise to the appearance that off-task behavior is volitional when it is not. Because of this failure to consider this evidence, the Court affords less deference to the SRO Decision.

Beyond the Dr. Ayarbe IEE, the HO and SRO minimized significant

indicators that W.T. was performing poorly without an IEP. W.T. spent the entirety of sixth grade without an IEP, and the SRO Decision makes a finding of fact that W.T.'s sixth grade grades were primarily C's, D's, and F's, with one B and several "P" grades. (SRO Decision at 13.) Despite this, the SRO Decision affirmed the determinations that W.T. was ineligible for an IEP based on testimony from teachers that "[W.T.] was able to access the general education curriculum without modifications." (*Id.* at 26.) The SRO Decision did not critically evaluate the clear and demonstrable contrast between this statement and W.T.'s actual performance, and therefore the Court affords less deference to the SRO Decision.

## 2.   ELIGIBILITY

The Court finds that a preponderance of the evidence shows that W.T. was substantively eligible for special education benefits under the category of HI. DCSD officials terminated W.T.'s IEP because they determined that W.T.'s academic and behavioral issues were due to willful defiance and not due to ADHD. However, as Dr. Ayarbe described, defiance and related behaviors such as blurting and making inappropriate comments are not necessarily willful acts but in fact are common symptoms of the disorder for which W.T. was seeking accommodation. Viewed in this light, the Court finds that three categories or pieces of evidence demonstrate by a preponderance of evidence that W.T. required special education services to access the curriculum: (1) Dr. Ayarbe's IEE; (2) the remaining reports, namely Dr. Fischer & Dr. Harootunian's August 26, 2019 FBA, Rosemary Thomas's August 2019 Occupational Therapy Evaluation, and Dr. Stevenson's February 2020 FBA; and (3) W.T.'s actual educational performance during the period at issue, including grades and observed classroom conduct. As discussed above, Dr. Ayarbe's IEE clearly supports the finding that W.T. was eligible, since the IEE recommended that he have an IEP.

The FBA prepared by Dr. Fischer and Dr. Harootunian included teacher

ratings of off-task and non-compliant behavior of mild to moderate severity. (Fischer-Harootunian FBA at 2, 4.) However, the observational reports based on nine observations indicated six instances of blurting or making noises, four instances of fidgeting, and two instances of dishonesty. (*Id.* at 2–4.) The Occupational Therapy Evaluation prepared by Rosemary Thomas found that W.T. is "Sensation Avoiding" and reflected that "[w]hen these individuals have to perform in an environment with overwhelming stimuli, it is important that they have opportunities and settings in which to take a break." (Thomas OTE at 4.) When W.T. was on an IEP, he had access to the special education room when he would become overwhelmed.

Dr. Stevenson's FBA is replete with observations of low compliance. Classroom observations tracking "group compliance," i.e. compliance with instructions given to the class as a group, showed low compliance ranging from 0% to 58%, and ratings for "individual compliance," i.e. compliance with instructions given to W.T. individually, were higher, though widely varied. (Dr. Stevenson FBA at 17.) The FBA noted that "it cannot be determined if [W.T.'s] behaviors of concern are a function of him not wanting to do the work or him not having the skills to complete the work" and stated that "[i]t is recommended that a formal behavior [plan] is implemented to address behavior concerns that are impacting [W.T.'s] success." (*Id.* at 18, 23.) This and other recommendations such as increased work times show that general education supports were not sufficient to support W.T.'s access to the curriculum.

On balance, these reports weigh toward a finding that W.T. requires special education in order to access the curriculum. The Fisher-Harootunian FBA and the Thomas Occupational Therapy Evaluation reported issues of mild to moderate severity, which do not weigh strongly for or against W.T.'s IDEA eligibility, but the Dr. Stevenson FBA, like the Dr. Ayarbe IEE, evinced significant problems and recommend a formal behavior plan. This evidence therefore weighs toward a

finding of IDEA eligibility.

W.T.'s grades in the time following his improper exit from special education are consistent with an inability to access the curriculum. A Section 504 Referral signed June 1, 2019 showed that W.T. had midterm grades of two D's, one C, and one B, and indicated that W.T.'s grades have become lower each year. (Admin. R. at 1110–14.) W.T.'s 2019–20 grades were similarly poor, with a D in English in semester 1 and a P[4] in semester 2; a C in social studies in semester 1; and a D in math in semester 1. (*Id.* at 1615–26.) There are multiple "U" [unsatisfactory] grades for "conduct" indicated.

The main pieces of evidence which led to the determinations that W.T. was ineligible under any category were the opinions of W.T.'s classroom teachers that W.T. willfully chose not to work and could access the curriculum when he wanted. W.T.'s teachers noted that W.T. would have difficulty staying on task but observed that W.T. was capable of performing work when he was in a good mood or was particularly interested in the subject matter (*e.g., id.* at 1870 ("[H]is mood would decide if he was going to work that day or not.")). From this observation, they concluded that W.T.'s academic problems were "due to his refusal to complete work" (*id.* at 1341) and therefore W.T. should not receive special education benefits. While the Court credits this testimonial and observational evidence, it appears that the SRO Decision overly credited this evidence and conflated observational statements about W.T.'s mood and desire only to do work that interested him with the legal conclusion that W.T. does not require special education to access the curriculum.

In other words, it is not that the Court disagrees with or discredits the observations of the teachers, but rather finds that those observations do not point so unequivocally to the conclusion that the HO Decision and SRO Decision drew.

---

[4] The grade indicated a percentage of 65.6%, indicating a transition to a P/F system between semesters since 63.41% merited a D in semester 1.

The central issue, described in the Dr. Ayarbe IEE, is that ADHD impacts one's ability to follow directions and sustain motivation in the absence of a natural motivation, such as personal interest in the subject matter, and that this phenomena can be easily interpreted as work refusal or willful avoidance. Given this fact about ADHD, the Court weighs the teachers' observations as a more ambiguous or neutral factor, rather than a determinative factor. The teachers' observations fit the mold of a student whose ADHD-related motivational problems prevent them from accessing the curriculum, yet there are observations of instances or periods in which W.T. did successfully participate in the curriculum.

Nonetheless, the teacher opinions and observations must be contextualized against the classroom observations conducted for the FBAs, which showed a great deal of noncompliance and disruptive behaviors. The Dr. Stevenson FBA showed that W.T. complied with instructions given to the group a maximum of 58% of the time and in many instances much more infrequently. Instances such as hitting his Chromebook were also documented. (Dr. Stevenson FBA at 6.) The Fischer-Harootunian FBA also documented, albeit in less detail, instances of blurting and making noises, not working, and dishonesty. (Fisher-Harootunian FBA at 2–4.)

Such classroom observations, viewed in conjunction with generally poor grades relative to W.T.'s average intelligence, do not suggest that W.T. was able to access the curriculum without accommodations. The Court finds that a preponderance of the evidence shows that W.T. was eligible under the category of HI.

## IV.  MOTION TO STRIKE

In the July 27, 2021 joint case management report, the parties stated that they "agree that there is no need at this time for initial disclosures since this is an administrative appeal which is exempt from the disclosure requirements of [Fed. R. Civ. P.] 26(a)(1)(B)(i)." (ECF No. 15 at 6.) On January 24, 2023, Plaintiffs

filed a supplemental initial disclosure and motion to lodge under seal containing a Statement of Eligibility for an IEP dated January 19, 2023, which indicated that W.T. was eligible under the HI category, as well as a Psychoeducational Assessment Report by Dr. Scott Barclay dated January 19, 2023. (ECF No. 59.)

DCSD filed a motion to strike on January 30, 2023, which argues that the supplemental initial disclosure should be stricken or excluded because: (1) it was filed in contravention of the parties' stipulated agreement not to engage in initial disclosures; (2) it was filed in violation of Local Rule LR 7-2 which prohibits supplementation without leave of court; and (3) it constitutes additional evidence that will transform the Court's limited review into a trial de novo. (ECF No. 63.) Plaintiffs respond that the IEP and assessment are relevant because they show that W.T. currently "requires intensive instructional support that is not sustainable in general education and requires special education and related services" and that the IEP establishes W.T.'s current eligibility as a matter of law. (ECF No. 64 at 2.)

The Court finds that this evidence was filed in violation of Local Rule LR 7-2(g) as well as in contravention of the parties' stipulated agreement regarding initial disclosures. On the substance of the filing, as DCSD points out, W.T.'s current eligibility status is not relevant to the instant case, which concerns the period between January 24, 2019 and June 22, 2020. Though the IEP may be legally binding were W.T. to transfer back to DCSD now, it does not bear on the period at issue.

Irrespective of the substance of the filing, the filing was made without leave of Court, a procedure which exists in part to address concerns such as relevance.[5] The unsolicited filing of these documents required DCSD to incur the

---

[5] The Court agrees with DCSD that the grant of Plaintiffs' motion to file under seal by U.S. Magistrate Judge Baldwin does not count, since that motion only determined the sealing aspect. (ECF No. 61.) DCSD did not have an opportunity to respond to the motion to file under seal and thus the supplementation issue was not adjudicated.

costs to bring this motion. DCSD's motion to strike (ECF No. 63) is granted and Plaintiffs are ordered to pay the attorneys' fees and costs of bringing the motion.

**V.    CONCLUSION**

Plaintiffs' Motion for Summary Judgment (ECF No. 42) is granted. DCSD's Motions for Judgment on the Administrative Record, or in the Alternative for Summary Judgment (ECF Nos. 43, 46, 66) are denied.

DCSD's Motion to Strike (ECF No. 63) is granted and DCSD's request for attorneys' fees and costs is granted. ECF No. 59 is ordered to be stricken.

Plaintiffs are directed to submit briefing, not to exceed twenty (20) pages, on the subject of remedies, including the issue of costs and attorneys' fees for the motion to strike, within sixty (60) days of the date of this order. DCSD will have twenty-one (21) days to respond and Plaintiffs will have fourteen (14) days to reply.

DATED THIS 11th day of August 2023.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE